UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 15-2710(DSD/FLN)

Elona Koonce,

    Plaintiff,

v.                                          **ORDER**

Union Pacific Railroad Co.,

    Defendant,

Jason Hungerford, Esq., Matthew H. Morgan, Esq., Nicholas D. Thompson, Esq., and Nichols Kaster, PLLP, 80 S. 8th Street, Suite 4600, Minneapolis, MN 55402, counsel for plaintiff.

Daniel R. Mitchell, Esq., and David J. Koob, Esq., and Donna Law Firm, P.C., 7601 France Avenue S., Minneapolis, MN 55435 and Thomas A.P. Hayden, Esq. and Union Pacific Railroad Company Law Department, 101 N. Wacker Drive, Suite 1920, Chicago, IL 60606, counsel for defendant.

This matter is before the court upon the parties' cross motions for summary judgment. After a review of the file, record, and proceedings herein, and for the following reasons, the court denies the motions.

**BACKGROUND**

This employment dispute arises out of plaintiff Elona Koonce's resignation from her position as a bridge tender for defendant Union Pacific Railroad Company (UP). UP hired Koonce on February 18, 2014. Koonce was responsible for opening and closing a swing bridge to allow river and rail traffic to pass as needed. Koonce

trained with experienced bridge tenders for several weeks before UP placed her in the field. Koonce Dep. at 34:11- 36:23, 45:13-23. Although she had other options, Koonce ultimately chose to work the night shift - 12:00 a.m. to 8:00 a.m. - at Bridge 15 in St. Paul. Id. 42:12-43:20. She had no concerns about doing so, even though she understood she would be alone during her shift. Id. at 33:11-34:10.

Bridge 15 is located in a secluded wooded area accessible by private road. Id. at 71:15-72:19. Koonce worked in a "bridge shack," located in the middle of the bridge. Id. at 45:24-46:4. The bridge shack contained the controls for the bridge, a CB radio, a laptop, a space heater, and a telephone. Id. at 46:5-47:2. The telephone worked only occasionally, and Koonce and the other bridge tenders often relied on their cell phones. Id. at 48:1-50:12. According to Koonce, UP was aware that the telephone was unreliable. Id. at 59:8-20. Mark Watlington, Koonce's supervisor, denies knowing that the telephone did not work properly. Watlington Dep. at 27:11-15.

The handle lock on the door to the bridge shack broke soon after Koonce began working alone at night. Koonce Dep. at 52:15-24; Watlington Dep. at 28:8-9. Another employee reported the broken lock to UP. Koonce Dep. at 53:17-20. UP asserts that the bridge shack also had a deadbolt, which Koonce denies. Koonce Dep. at 47:11-16; Watlington Dep. at 28:3-9. The broken lock concerned

Koonce given the bridge's isolation, her late hours, and the fact that transients frequent the area. Koonce Dep. at 63:7-15, 72:10-19.

Soon after Koonce started working on her own at night, and while the lock was broken, two male employees from another railroad startled her by appearing at the bridge shack door without notice. Id. at 64:14-65:17. They asked to come into the bridge shack, but Koonce told them to go back to their train. Id. at 66:2-22. The next morning, Koonce told Watlington about the incident and requested a new lock on the door. Id. at 68:14-69:2. According to Koonce, Watlington told her he would take care of it. Id. at 68:3-5. Watlington testified that he had the lock fixed soon after he learned it was broken, but he does not recall when that occurred. Watlington Dep. at 28:3-24.

The following night, a man drove to the bridge, got out of his car, and stared at the bridge shack. Koonce Dep. at 76:14-77:5. Koonce was concerned that he would walk onto the bridge, so she opened the bridge to prevent him from doing so. Id. at 77:7-18. Koonce knew that she would need to close the bridge eventually to allow a train to cross, however. Id. at 80:2-24. After she opened the bridge, the man screamed and swore at her. Id. at 77:19-23. The phone in the bridge shack was not working, so Koonce called the police from her cell phone. Id. at 77:23-25. Due to confusion over whether St. Paul or Mendota Heights had jurisdiction over the

3

bridge shack, the police were never dispatched. Id. at 78:4-14. In the meantime, the man had gotten back in his car and pulled into the weeds next to the road. Id. at 78:18-24. Koonce then called her husband who came to the bridge and stayed there until the end of her shift. Id. at 78:15-79:7.

After her shift, Koonce reported the incident to Watlington. She again requested a new lock on the door and told him that she would not return to work until the new lock was in place or UP assigned her to another bridge. Id. at 83:16-85:10. Koonce told Watlington that a more senior male bridge tender, who also worked the night shift, offered to switch bridge assignments with her. Id. at 85:12-21; Watlington Dep. at 52:7-24. Watlington refused to allow the switch, however, and instead told Koonce that her option was to switch shifts with another female, who was then on the day shift, or to resign. Koonce Dep. at 86:25-87:12; Watlington Dep. at 31:19-32:11. Believing that the bridge was unsafe for any female employee given recent events, Koonce felt she had no choice but to resign.[1] Koonce Dep. at 87:6-12; Mitchell Decl. Ex. B at 1.

---

[1] Before Koonce resigned, her husband, also a UP employee, asked his supervisor, Paul Hinton, to help with the situation. Hinton Dep. at 11:2-8. Hinton contacted Watlington, who told him that existing procedures were sufficient to ensure Koonce's safety. Id. at 16:7-17:4, 19:1-16. Watlington admits that he was upset that Koonce's husband intervened because he believed that he was handling the situation appropriately. Watlington Dep. at 62:23-65:18. Koonce argues that this animus, at least in part, fueled Watlington's retaliation.

4

Koonce later filed a union grievance seeking reinstatement without success. Martindale Dep. at 15:12-16:12; Watlington Dep. at 74:18-24. Koonce then filed a complaint against UP with the Occupational Safety and Health Administration, but later elected to proceed in federal court pursuant to 49 U.S.C. § 20109(d)(3). Compl. ¶¶ 27-28. On June 11, 2015, Koonce filed the instant suit against Union Pacific, alleging retaliation in violation of the Federal Rail Safety Act (FRSA). Both parties now move for summary judgment.

## DISCUSSION

### I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere

5

denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists – or cannot exist – about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Retaliation**

To establish a prima facie case of retaliation under the FRSA, Koonce must show that: (1) she engaged in protected activity; (2) UP knew that she engaged in protected activity; (3) she suffered an adverse employment action; and (4) "the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." Kuduk v. BNSF Ry. Co., 768 F.3d 786, 789 (8th Cir. 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)). If Koonce makes a showing that the protected activity was a "contributing factor" in the adverse employment action, UP may avoid liability by proffering "clear and convincing evidence," that it would have taken the same action without that protected activity. Id. (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)).

UP concedes that Koonce engaged in protected activity by reporting the bridge incidents to Watlington and that it knew she

engaged in protected activity. Therefore, the court will consider only whether Koonce suffered an adverse employment action and, if so, whether there is a causal connection between the protected activity and the adverse action.

### A.   Adverse Employment Action

UP argues that Koonce cannot establish that she suffered an adverse employment action because she voluntarily resigned instead of accepting the reasonable alternative offered to her, that is, to work a day shift on a different bridge. Koonce responds that she was constructively discharged because the alternative offered was untenable given that it would have put another female employee in harm's way. Koonce stresses that she would have returned to her night shift on Bridge 15 if UP had simply fixed the lock. Although not entirely clear, UP either denies knowing that the lock was broken before Koonce resigned or believes that there was a deadlock on the door that could have secured the bridge shack notwithstanding the broken handle lock. The lock issue is the key to this case. If UP is correct, then Koonce's resignation was truly voluntary and she cannot establish the requisite adverse employment action. If, on the other hand, Koonce is correct, UP constructively discharged her by forcing her to resign.

UP argues that Koonce cannot establish constructive discharge as a matter of law because she has not shown that it "deliberately created intolerable working conditions with the intention of

forcing her to quit." Alvarez v. Des Moines Bolt Supply Co., 626 F.3d 410, 418 (8th Cir. 2010). The court disagrees. Koonce's testimony is sufficient to establish the elements of constructive discharge. UP's contradictory evidence simply creates a genuine issues of material fact.

### B.  Causal Connection

There are also fact issues precluding summary judgment on the requisite causal connection between Koonce's departure from UP and her protected activity. Under the circumstances, it is difficult to separate the two issues given the record. As noted above, if UP is believed, then its decision was unrelated to Koonce's safety complaint. The converse is true if Koonce's testimony is credited. Because the outcome of this dispute depends on the weight and credibility attributed to the evidence, summary judgment is not warranted.

### CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for partial summary judgment [ECF No. 32] is denied; and

2.  Defendant's motion for summary judgment [ECF No. 36] is denied.


Dated: December 1, 2016

                                      <u>s/David S. Doty</u>
                                      David S. Doty, Judge
                                      United States District Court